## Supreme Court—General Term—First Department.

*January*, 1886.

### PEOPLE *v.* CROWLEY.

#### RAPE—CHALLENGE TO JURORS.

A juror is competent who declares on oath that, notwithstanding an opinion or impression entertained in reference to the accusation to be investigated, he believes that he can render a verdict without being influenced in any way by the opinion that he has formed. *Code Crim. Proc.* § 376, *subd. 2.*

The complainant, on the trial of defendant for rape, testified that defendant had connection with her; that, when he was on her, she felt his person in her. *Held*, sufficient evidence of penetration.

APPEAL by defendant, David H. Crowley, from a judgment of the Court of General Sessions of New York, Hon. FREDERICK SMYTH presiding, of 18th May, 1885, convicting defendant of rape.

The prosecutrix, Maggie Morris, was a young working girl, sixteen years old, living with her mother, and of chaste character, so far as appeared on the trial.

The defendant was a sergeant of police in the city of New York.

The testimony given on behalf of the prosecution was in substance as follows:

On the evening of the 25th of April, 1885, the prosecutrix went with a female companion to Standard Hall, where an entertainment was in progress, which was given for the benefit of one of a circle of friends who had lost his mother and was in financial distress.

About half-past one the defendant, who had been drinking, but who was not drunk, reached the hall.

A little later he was introduced to Maggie Morris by Jacob Burns, one of the young men at the ball, who said, "Miss Morris, Sergeant Crowley; Miss Morris, Sergeant Crowley would like to have a dance." She arose to dance with him and walked across the room, when "he said, we will have something to drink before we dance." She declined the invitation to drink anything, being "sick of sarsaparilla," and not drinking whisky. While they were talking they were proceeding to the passage-way between the ball-room and the cloak-room, where a temporary bar had been erected for the purpose of serving refreshments to the dancers. This passage-way was known as the ball-room bar-room.

They had reached a point about the head of the stairs which went down to the basement story, when he asked her to go to a restaurant and have some oysters. This invitation she also declined. He then asked "the boss" if he could go down-stairs, but "the boss" said, no; the place was locked up. Crowley then made the same request to the bar-tender, when Maggie Morris stated that she was not going down-stairs, and asked Crowley why, if he wanted to drink, he did not drink up-stairs. The reason he gave was, that he did not care to be seen drinking up-stairs, for there were people observing him who would be glad to criticise him. In this respect the evidence of the prosecutrix and the defendant agree.

The bar-keeper having expressed his readiness to permit Crowley to go down-stairs, and the girl being reluctant, he caught hold of her by the wrist, and gave her a sort of a jerk down-stairs, and, the stairs being narrow, she found herself in a moment in the basement bar-room.

As soon as she got down she made an effort to get up again, but Crowley detained her. The light in the place being very

dim, Blint, the bar-keeper, went to turn it up, but Crowley ordered him to leave it alone and he did so. Crowley then led the girl to a chair, near the middle of the room, and sat down by her, and ordered Blint to bring sarsaparilla for her and whiskey for him. Blint left for the purpose of getting the drinks, and was absent some minutes.

While Blint was absent a young man, coming down-stairs, passed the door and went into the dining-room in the rear. Crowley, perceiving him, took his revolver from his pocket, and, with an oath, said that he would fix him if he came in there. The young man did not come, but Blint returned with the drinks, which he put upon a chair next to Maggie Morris. She tasted hers, and, perceiving there was whiskey in it, put it down.

Crowley thereupon ordered Blint to turn the gas down, and he obeyed. Miss Morris begged him to turn it up, which he did "the least little bit." The girl then begged Blint to send her friend down to her, meaning Celia Joyce, with whom she had come to the ball. Crowley told him not to mind her friend, but to go out and lock the door.

Blint went out and locked the door and took the key, and put it behind the bar in the bar-room ball-room. Maggie Morris, perceiving that the door was locked, ran over to it; but Crowley pulled her back. He then told her that unless she did all he wanted, he would fix her. She replied, "you had better let me go up-stairs; I have a brother, and he will fix you." Then he caught her by the shoulders, and told her that he would let her go if she would kiss him; upon this promise she consented; but when she had kissed him he laughed and refused to let her go. After some struggling, he then took hold of her and lifted her upon the billiard table. She cried out, hearing her friends running down the stairs, "I will scream if you do not let me go." He replied, "if you scream I will fix you," showing his revolver.

"Q. Were you frightened? A. Yes, sir. Q. Did you believe what he said, that he would fix you? A. Yes, sir. Q. Did you make any resistance to him? A. Yes, sir. Q. What did you do when Crowley put you on the table and lay on you ;

now, just tell the jury what you did, what you said—if you said anything. A. I did not say anything, for I was afraid. Q. What was your state of mind? A. I thought I would be killed. Q. Then what; go on, you have got to tell? A. Then he lay down on me. Q. Then what next; you have got to tell; what did he do; you can tell me about it? A. Then he done what he wanted to do to me. Q. What do you mean by that? you can tell me—he had connection with you? A. Yes, sir."

The complainant further testified : " When Sergeant Crowley was on me, I felt his person in me."

As soon as he released her, she jumped up and ran again over to the door; he pursued her and pulled her down the steps again, and dragged her over to a chair.

Meanwhile the girl's friends up-stairs having missed her, asked Blint to let them go down-stairs and look for her. To the number of eight or ten they went down-stairs, examined the dining-room and the kitchen, but not finding the girl, went up-stairs through the upper stories of the building in search of her. Going back, Lemaire, one of her friends, demanded of Blint entrance into the bar-room down-stairs, where, by this time, not finding the girl elsewhere, they concluded that she must be. Blint stood at the entrance to the stairs with a mallet and knife in his hand, refusing to let any one pass.

Such was the condition of affairs when officer Walsh of the seventh precinct, hearing the disturbance, came in, found Blint standing at the head of the stairs, as described, and heard him say that he would not let any one go down-stairs, except they went over his body. Walsh told him that he was going down-stairs, and did go down and searched the dining-room and the kitchen in the rear.

Then Blint got the key, went down-stairs, and said to Crowley : " Crowley, they are making a terrible fuss about you up-stairs."

Crowley replied : " Can't you open the front door? " which Blint did. The girl made a rush for the door; Crowley pulled her back, got out first, ran up the few steps, two at a time, and fled away.

When Blint first perceived Maggie Morris, on going down

into the bar-room, she was crying. She ran up immediately after Crowley, and her friend Celia Joyce being at hand, fell into her arms, exclaiming: "For God's sake, kill me, I am ruined." She was crying and moaning; her dress and hair were "mussed and disarranged;" she was carried by her friends up into the cloak-room, where, for some minutes, she lay in a sort of fainting condition in the arms of her female friends.

Meanwhile officer Walsh arrested Blint, and took the whole party to the station-house, where Sergeant Sheldon interrogated Maggie Morris regarding Blint only. Sergeant Crowley was not there at the time, and the girl made no specific charge against him, but mentioned the fact that he had threatened her with a pistol. The sergeant told her to be at the Essex Market Police Court the next morning, and make a detailed statement to the judge.

Maggie Morris then left the court-room and walked home with her friends, and, the hour being very late, spent the night at the house of her friend Jennie Howard; got up the next morning at half-past six, went home, stayed there until it was time to go to church, went to mass, and then went to the Essex Market Police Court, and told to the justice all the particulars of the adventure.

Blint, who was indicted with Crowley, was examined on behalf of the prosecution, Crowley being alone tried.

Dr. Samuel B. McCleod, a physician, who examined the complainant within a day and a half after the occurrence, testified that he examined the genitals, found the external genitals swollen and the lining of the membrane very much reddened and inflamed, and both in a state of a great deal of irritation; that the irritation extended down to the internal parts of the genital organs; that the hymen, although not ruptured, was somewhat unusually open, and that he thought it likely that the inflammation of the examined parts was the result of the application of some force to the external genitals.

Two of the jurors were challenged by the defense for bias and the following proceedings were had:

Upon the direct examination, George S. Squire testified that he knew of no other reason, besides an interference with his

business, why he should not serve as a faithful and impartial juror in the case, except an impression which he had got from reading the newspapers, as any other person would; and on cross-examination, he swore that it would require some evidence to remove from his mind the opinion he had formed; but he also swore, that notwithstanding such opinion as he had derived from reading the newspapers, he could then swear that he believed such opinion would not influence his verdict, if evidence was introduced sufficient to change it, and that he could render an impartial verdict in the case according to the evidence. Further on, in answer to the questions of the Recorder, he testified that, notwithstanding the fact that he had formed an opinion from what he had read upon the question of the guilt or innocence of the defendant, and notwithstanding the fact that he did entertain a present opinion or impression upon that question, he believed that he could, if selected as a juror, determine the question of the guilt or innocence of the defendant upon the evidence, and without being influenced by the opinion that he had formed.

The juror Bernard A. Schmidt stated that he knew of no reason why, if impaneled and sworn on the jury, he could not give a fair, impartial, and conscientious verdict upon the evidence. He then stated that he had formed an impression which he guessed was strong enough to call an opinion, and which, to remove, would require evidence. Further on he stated that he had no knowledge of the transaction independent of what he had read; that he had served as juror before, was familiar with the duties of jurors, and knew that it was the duty of the juror to decide a case only upon the evidence; then, in answer to the district attorney, he testified that, notwithstanding any opinion or impression that he might have derived from reading the newspapers, he could now say upon his oath that he believed that such an opinion or impression would not influence his verdict, and that he believed that he could render an impartial verdict according to the evidence. In answer to the court, he stated that, notwithstanding that he had formed an opinion upon what he had read and upon nothing else, he could go into the jury-box and try the case impartially and fairly, regardless of any

opinion which he had formed from his perusal of the newspapers. In answer to the counsel for the defendant, he then stated that he went into the jury-box with a ·plain, unprejudiced mind, that he always judged a case from the evidence, and that he would, upon entering the jury-box, discharge altogether from his mind any opinion or impression which he might have formed.

The challenges to these two jurors were overruled by the court, and defendant excepted.·

*D. Edgar Anthony* (*George Bliss* and *H. F. Lawrence*, of counsel), for defendant, appellant.

I. The jurors George S. Squire and Bernard A. Schmidt having each formed *opinions* which they severally swore would require evidence to remove, were disqualified as jurors, and the court erred in overruling the challenge of each for actual bias.

Section 376 of the Code of Criminal Procedure is substantially a re-enactment of section 1, chapter 475 of the Laws of 1872, and, notwithstanding its provisions, " a person who has formed or expressed an opinion or impression in reference to the guilt or innocence of the defendant is still, as formerly, disqualified to sit as a juror, unless three things shall occur : 1. He must declare on oath that he believes that such opinion or impression will not influence his verdict. 2. He must also declare on oath that he believes he can render an impartial verdict according to the evidence ; and 3. The court must be satisfied that he does not entertain such a present opinion or impression as would influence his verdict. .Unless these three things concur, the person must now, as before, be excluded from the jury-box." People *v.* Casey, 2 *N. Y. Crim.* 194.

It is settled that the decision of the court below overruling the challenge is reviewable on appeal, both as to the law and facts. Not only must the court below be satisfied that the proposed juror " does not entertain such a present opinion or impression as would influence his verdict," but its being so satisfied should be the rational result of the exercise of a sound judicial discretion. Affecting, as it does, a substantial right, the appellate court should inquire whether or not it was justified by the facts. Greenfield *v.* People, 74 *N. Y.* 277 ; Balbo *v.*

People, 80 *Id.* 484; Cox *v.* People, *Ib. Id.* 500; People *v.* Cornetti, 1 *N. Y. Crim.* 303.

*a.* Referring to the examination of the juror Squire, it will be seen that he probably conformed to the first and second requirements, but this alone is insufficient. *With these the third prerequisite does not concur.* He stated he had formed an opinion which it would require some evidence to remove, and after conforming, apparently, to the first and second requirements, he reiterated the first statement, thereby materially impeaching his declarations. It is contended that the final answers made by Mr. Squire materially impeached his former declarations and the defendant's challenge should have been sustained.

*b.* Referring to the examination of the juror Schmidt, the *attempt* to conform to the first and second prerequisites is found in the following: "Q. (by the Court)—Notwithstanding that fact that you did form this opinion upon what you read and upon nothing else, could you go into that jury-box and try this case impartially and fairly upon what witnesses would testify to on the stand here, regardless of any opinion which you have formed upon what you read? A. Yes, sir; if I was to go into the jury-box *I would make up my mind I should have no opinion,* and be governed according to the evidence." This does not meet *any* of the statutory requirements. The juror stated that, if a certain contingency happened, he "*would make up his mind*" *that he should have no opinion.* The word "should" is here capable of two interpretations, either as synonymous with "ought to" or with "would." If used in the former sense, as more properly it should be, he was referring to his duty as a juror, and manifestly not supplying *any* of the prerequisite for his qualification as such. People *v.* Casey, 2 *N. Y. Crim.* 194. If used in the latter sense, he was "not speaking of an ascertained fact, but only of a *purpose of mind*" at the most, carrying out of which depended very much upon the strength of will and general mental capacity of" the juror. Too much stress is not to be laid upon such a declaration of a juror. Greenfield *v.* People: 74 *N. Y.* 227; People *v.* Mather, 4 *Wend.* 229; People *v.* Tyrrell, 3 *N. Y. Crim.* 142.

But, beyond this, it appears by his examination that the last question and answer before his entrance into the jury box was: "Q. But you have formed an opinion upon this now without evidence, and that opinion, which you now have, it would require evidence to remove?" "A. Yes, sir."

The challenge to each of the jurors for actual bias should have been sustained.

II. The verdict was against the weight of evidence. Rules of law governing cases of rape are laid down in 4 *Black Com.* 213; 1 *Russ. on Crimes*, 9th ed. 902, 904, 921, 926; 1 *East. P. C.* 10, § 7, p. 445; *Roscoe's Crim. Ev.* 879; 1 *Hale's P. C.* 628–635, and cases cited at 634. It is the duty of the court to caution the jury as to the nature of case and the evidence. 2 *Bishop Cr. Proc.* § 968; People *v.* Hagerman, 47 *Iowa*, 151; 1 *Hale P. C.* 635; People *v.* Hulse, 3 *Hill*, 309. *a.* Long after she had been laid hold of and had reason to apprehend, nay, to know his purpose, and before any threat was made, she was *passive*, if not consenting; in short, there was not the utmost reluctance and resistance. There must be the utmost *reluctance* as well as resistance to warrant conviction. People *v.* Dohring, 59 *N. Y.* 374; People *v.* Burgdorf, 53 *Mo.* 67; People *v.* Morrison, 1 *Park.* 625; People *v.* Abbot, 19 *Wend.* 192; People *v.* Quin, 50 *Barb.* 128. *b.* She was not *continuously* under duress "or in fear of immediate and great bodily harm, which she had reasonable cause to believe would be inflicted upon her," from the time she was first laid hold of till the act was committed. In these cases the material issue is on the willingness or reluctance of the prosecutrix — an act of the mind. The connection must be absolutely against the will. People *v.* Abbot, 19 *Wend.*. 194; People *v.* Quin, 50 *Barb.* 128. A mixed case will not do. People *v.* Morrison, 1 *Park.* 644; citing People *v.* Abbot (*supra*); and see People *v.* Burgdorf (*supra*); People *v.* Hulse, 3 *Hill*, 309. Duress or fear of death will excuse resistance on the female's part, but it follows as a clear logical deduction from the cases that if it cease at any time, after his purpose is known and before the crime of rape is effected and its place is not taken by physical force, she is called upon to make the utmost resistance she is capable of under the circumstances. See People *v.*

Dohring (*supra*). The threats were meagre and her conduct is unequivocally against the presumption that such duress or fear existed as excuses resistance and outcry. *c.* It is improbable, if not impossible, that the assault could have been committed in the manner she described.

*Randolph B. Martine,* district attorney (*De Lancey Nicoll,* assistant), for the people, respondents.

BRADY, J.—The appellant complains of injustice done him in the selection of the jury, and for the reason that two jurors were empanelled who were disqualified on account of actual bias. The contention, however, is groundless for the reason that each of the jurors distinctly stated that, notwithstanding an opinion or impression entertained in reference to the accusation to be investigated, he could, he believed, render a verdict without being influenced in any way by the opinion that was formed. This was a compliance with the statute on the subject, which was discussed in the case of Casey *v.* People (2 *N. Y. Crim. Rep.* 194; 96 *N. Y.* 115), and which adjudication is an authority for sustaining the ruling of the learned recorder in the court below, who overruled the challenge for cause.*

The evidence in the case abundantly presented all the elements necessary to constitute the crime with which the appellant was charged, and the accuser was sufficiently corroborated within the legal rules applicable to such an offense. It is not deemed necessary to go into particulars upon the subject, which is not an agreeable one to elaborate. It is considered enough to say that a careful examination of the testimony in the case demonstrates the existence of all the facts necessary to establish the offense alleged.

The charge of the learned recorder presented for the consideration of the jury all the salient features of the prosecution and defense. The rules by which they were to be governed in their deliberation and which should control them in the ren-

---

* As to disqualification of jurors by opinion or impression, see Peop'e *v.* Welch, 1 *N. Y. Crim. Rep.* 486; Peop e *v.* Tyrell, 3 *Id.* 142; People *a.* Willett, *Id.* 324; People *v.* Carpenter, *infra,* p. 39.

dition of their verdict, whether of guilty or not guilty, were explicitly stated, and nothing was omitted to make a full exposition of the legal principles involved in the investigation.

The requests to charge were refused by the learned recorder qualifiedly, *i. e.*, by stating that they were declined, except as he had on the subject to which they related charged the jury. An examination of the whole charge shows that the elements embraced in these various requests were properly and duly expressed to the jury in as favorable light as the appellant could claim.

The evidence established violence by the accused, fear and apprehension on the part of the accuser, as contemplated by section 278 of the Penal Code, and actual penetration without the consent of the accuser. Whatever may have been the rule in regard to penetration in early times in England, since the passage of the statute of 9 *George* 4, chapter 31, section 18, it has been the law of that country that a penetration, however slight, was complete in law. Rex *v.* Russen, 1 *East P. C.* 438; Rex *v.* Jennings, 4 *C. & P.* 249; Reg. *v.* Allen, 9 *Id.* 31; Reg. *v.* Hughes, *Id.* 752; Reg. *v.* Stanton, 1 *C. & K.* 415.

In the last mentioned case the testimony was somewhat akin to that given by the accuser in this case. There the prosecutrix said, "I felt the parts of the defendant under mine just a little;" which was held to be sufficient.

In this country proof of the slightest penetration has been regarded as sufficient. See *Hale's Pleas of the Crown*, p. 628 and note; State *v.* Hargrave, 65 *N. C.* 466; Waller *v.* State, 40 *Ala.* 352; State *v.* Le Blanc, 3 *Brev.* (*S. C.*) 339; *Guy's Principles of Forensic Medicine*, Eng. ed. 1881, 60; *Taylor on Medical Jurisprudence*, 7th Am. ed. 701; *Prof. Ogston's Lectures upon Medical Jurisprudence*, 90; *Beck's Medical Jurisprudence*, 229 to 233.

The language of our statute is in accord with the rule proclaimed by these authorities, which by section 280 of the Penal Code is as follows: "Any sexual penetration, however slight, is sufficient to complete the crime."

These views dispose of all the questions submitted upon this

appeal for our consideration, except one, namely, that the verdict is against the weight of the evidence.

The record shows that the prosecutrix was in the enjoyment of a festivity when introduced to the appellant, who induced her by invitation, though she went reluctantly, to leave the company of which she was one, and go to another room, descending a flight of stairs to accomplish that purpose; that appellant sent for drinks, and refusing to let her go directed the lights to be turned down, the door closed and locked, sought embraces from the prosecutrix, and then by force still refusing to let her go, placed her in a position where he could effect his purpose, threatening, with pistol presented, to do her bodily injury if she resisted or made any outcry; and further, that when her absence long continued, was discovered by her friends and he heard of the tumult it had occasioned, he departed suddenly by way of the nearest door leading to the street, leaving the prosecutrix, who rejoined her friends and made an exclamation indicative of what had occurred. In many of these details she is corroborated and sustained by the evidence, and as to the act of penetration, by her physical condition disclosed upon an examination by the physician called to testify upon the subject, a condition indicating violence, but showing continued virginity.

The statement of the appellant was an absolute and unqualified denial of any violence or attempted violence, and his explanation of asking the prosecutrix to go with him into another room was, that he desired to drink with her, and did not want to expose himself to such criticisms as might be pronounced upon him if he were seen doing that act. His examination was very unsatisfactory in its details, and failed to impress the jury in his favor. We are not insensible to the fact that an accusation, such as made against the appellant, is easily manufactured, and should be critically investigated, and we have examined the evidence in view of these elements. The offense is one well-calculated to excite great public indignation and great clamor; but the rules relating to the trial of such an offense are so guarded that the accused is protected from unjust prejudices. It would, indeed, be a disgrace to our laws if he were not fully and thoroughly secured from their influences, no mat-

ter from what source they emanate or by what means created—
a circumstance kept in view on the consideration of this appeal.
It may be here said, as germain to this subject, that while the
denunciation of crime should be extolled, the continued refer-
ence to any one by particular mention and censure should not
be indulged in prior to the trial of the accused.

He should have every opportunity to defend himself, no matter
how convincing the developed facts may be, and his guilt should
not be forestalled or his defense weakened by a spirit of con-
demnation incited by public criticism.

The record, however, considered in all its different phases,
leaves no other impression upon the mind than that of the guilt
of the appellant. The prosecutrix is young, but, in so far as
the record discloses, virtuous and respectable though in humble
life. Nothing, indeed, against her — except that she went to
such a place of amusement — has been found, but, while there,
she was conducting herself properly and indulging only in an
innocent pastime. · It would be very extraordinary, indeed, for
this court, under such circumstances, to entertain for one mo-
ment the project of granting a new trial upon the ground that
the verdict was against the weight of evidence.

It may be said, with very great propriety, that it rarely hap-
pens that a prosecution for rape is so abundantly sustained in
all its essential features as this was. Perhaps a particular
scrutiny of every fact and circumstance of the case might dis-
close some that were inconsistent with the appellant's guilt, but
this is always a peculiarity, if such it may be called, of prose-
cutions not only for this crime, but for crimes generally. The
great and overwhelming mass of evidence, however, is in favor
of· the truth of the accusation made against the appellant.

Assuming that the verdict of the jury is correct, which we
see no reason to question, the appellant had been guilty of an
atrocious crime, one which he could the more readily accom-
plish by exciting fear and apprehension than a person not
connected with the police, and, therefore, his punishment on
conviction was justly severe. Clothed with authority and in-
vested with high obligations and responsibilities, it was his duty
to protect the prosecutrix and not to seek her destruction. It

was a duty he owed to her, to the community, to the department to which he belonged, and to himself. He abandoned all, selecting for his victim a youthful maiden of innocence and respectability, who, although in the humbler walks of life, was entitled to all the protection that could be furnished to any person in any other sphere.

The verdict was in all respects just, the judgment that followed it was proper and exemplary, and this court will not interfere with it in any way.

DANIELS, J., concurs, DAVIS, P. J., taking no part in the decision.